**Slip-Op. 00-144**

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NMB SINGAPORE LTD and PELMEC INDUSTRIES (PTE) LTD | |
| Plaintiffs, | |
| v. | Court No. 00-07-00373 |
| UNITED STATES OF AMERICA | |
| Defendant, | |
| v. | |
| THE TORRINGTON COMPANY | |
| Defendant-Intervenor. | |

[Plaintiffs' motion for preliminary injunction is granted.]

*White & Case* (Walter J. Spak, Christopher F. Corr, Lyle B. Vander Schaaf, Richard J. Burke), Washington, D.C. for Plaintiffs.

*Mary Elizabeth Jones*, Attorney-Advisor, Office of the General Counsel, International Trade Commission, Washington, D.C., for Defendants.

*Stewart & Stewart* (Terence P. Stewart, Geert De Prest), Washington, D.C., for Defendant-Intervenors

**MEMORANDUM OPINION**

**CARMAN, Chief Judge:**

Plaintiffs move for a preliminary injunction following a finding by the United States International Trade Commission (ITC) after a five-year sunset review that revocation of antidumping orders on anti-friction ball bearings from Singapore would likely lead to a recurrence of material injury to the domestic industry within a reasonably foreseeable time. Plaintiffs seek to enjoin the United States from liquidating any and all unliquidated entries of ball bearings from Singapore manufactured or exported by Plaintiffs and entered for consumption or withdrawn from warehouse after January 1, 2000, until the lawsuit commenced by the Plaintiffs challenging the ITC's sunset review determination, receives final judicial review. Defendant, United States, consents to the issuance of a preliminary injunction. Defendant-Intervenor, The Torrington Company, objects.

**BACKGROUND**

On April 1, 1999, the ITC initiated a five year sunset review pursuant to section 751(c) of the Tariff Act of 1930, as amended by 19 U.S.C. § 1675(c) (1994) (hereinafter, sunset review). This review covered certain ball bearings from China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom. *See Certain Bearings from China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom*, 64 Fed. Reg. 15783 (April 1, 1999). On July 2, 1999, the ITC determined that it would conduct a full review pursuant to the sunset law's provisions. On June 28, 2000, the ITC published notice of its final determination, finding in part that revocation of the antidumping duty orders on anti-friction ball bearings from Singapore would likely lead to recurrence of

material injury to the domestic industry within a reasonably foreseeable time. *See Certain Bearings from China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom*, 65 Fed. Reg. 39925, 39925 (June 28, 2000).

On July 7, 2000, pursuant to a request by the Plaintiffs, the Department of Commerce (Commerce) initiated the eleventh administrative review of the antidumping order at issue in this case. This review covered subject merchandise entered into the United States between May 1, 1999 and April 30, 2000. The Plaintiffs subsequently withdrew their request and, because no other party filed a separate request, the administrative review was terminated. Thus, by operation of law, any entries made between May 1, 1999 and April 30, 2000, would in the usual course have been liquidated in accordance with the 1.26% antidumping duty rate established by the tenth administrative review.[1]

On August 25, 2000, Plaintiffs filed a summons and complaint with this Court challenging the ITC's sunset review final determination. Plaintiffs timely filed this motion for preliminary injunction seeking to enjoin liquidation of all unliquidated entries of subject merchandise manufactured or exported by Plaintiffs and entered or withdrawn from warehouse after January 1, 2000.[2]

---

[1] *See* 19 C.F.R. §351.212(a) ("Generally, the amount of duties to be assessed is determined in a review of the [antidumping] order covering a discrete period of time. If a review is not requested, duties are assessed at the rate established in the completed review covering the most recent prior period or, if no review has been completed, the cash deposit rate applicable at the time merchandise was entered.")

[2] Commerce has issued a regulation establishing January 1, 2000 as the effective date of a revocation or termination of a transition order prior to, or as a result of, the initial sunset review. *See* 19 C.F.R. §351.222(i)(2)(ii). Transition orders are defined by 19 U.S.C. §1675(c)(6)(C)-(D), in relevant part, as "an antidumping duty order under this subtitle or a finding under the Antidumping Act of 1921… which is in effect on the date the WTO Agreement enters into force with respect to the United States, if such order is based on an investigation conducted by both the administering authority and the Commission." The antidumping duty order at issue in this case was originally issued in 1989 and, therefore, was in effect on the date the WTO Agreement entered into force. Although the antidumping order has been in place for eleven years 19 U.S.C. §1675(c) has only been in effect since 1995 and, thus, only one sunset review has been performed. As such, the subject matter of this litigation is within the purview of 19 C.F.R. §351.222(i)(2)(ii).

Prior to the Uruguay Round, the antidumping laws did not effectively restrict the duration of an antidumping order. Antidumping duties were imposed for as long as dumping or injury continued, subject only to the possibility of yearly administrative reviews establishing the applicable antidumping duty rate. The law, however, did provide that Commerce could revoke an antidumping order if there were no request for an administrative review of that order for four consecutive years. *See* 19 C.F.R. § 353.25 (1994). This provision, however, was infrequently used.[3]

With the passage of the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (Dec. 8, 1994), Commerce's regulations and the Trade Agreements Act of 1979 were amended to provide several methods by which an antidumping order could be terminated or revoked. An antidumping order may be revoked where Commerce determines that "[a]ll exporters and producers covered at the time of revocation by the order… have sold the subject merchandise at not less than normal value for a period of at least three consecutive years" and "[I]t is not likely that those persons will in the future sell the subject merchandise at less than normal value." 19 C.F.R. §351.222(b)(1)(i)-(ii) (1998). An antidumping order may also be revoked where either the circumstances surrounding the order have changed sufficiently to warrant revocation or where the producers accounting for substantially all of the production of the relevant domestic like product express a lack of interest in the continuation of the order. *See* 19 U.S.C. §1675(b); 19 C.F.R. §351.222(g) (1998).

Most relevant to this case, however, an antidumping order may be revoked or terminated by Commerce or the ITC through the sunset review process. *See* 19 U.S.C. §1675(c). This

[3] The Court notes two distinguished legal scholars have found that between January 1, 1980 and July 31, 1994 a total of 533 antidumping and countervailing duty orders were placed in effect. During the same period, however, only 162 orders (30.39%) were revoked. During this period, the average length of time a revoked duty order remained in effect was 8.28 years. *See* Raj Bhala & Anthony Kennedy, WORLD TRADE LAW at 628.

process requires Commerce and the ITC to invite interested parties to provide information pertaining to the impact that revocation of the antidumping order would have on the relevant domestic industry. *See* 19 U.S.C. §1675(c)(2). If this information is provided, it is then used to aid Commerce in determining whether the revocation of the antidumping order would likely lead to "a continuation or recurrence of sales of the subject merchandise at less than fair value." 19 U.S.C. §1675a(c)(1). The ITC similarly uses this information when determining whether revocation of the same order would likely lead to "continuation or recurrence of material injury within a reasonably foreseeable time" 19 U.S.C. §1675a(a)(1). If Commerce and the ITC make affirmative determinations, the antidumping orders are to remain in effect for an additional five years, subject to yearly administrative reviews. Under the sunset review procedures, this process is to repeat until either Commerce determines that there is no threat of continued or recurring dumping or the ITC determines that there will likely not be a continuation or recurrence of material injury to the domestic industry within a reasonably foreseeable time. *See* 19 U.S.C. §1675(c)(1)(C). Where, however, no interested parties submit information regarding the effect of revocation on the domestic industry, the antidumping duty order is automatically terminated. *See* 19 U.S.C. §1675(c)(3)(A).

## DISCUSSION

This Court has jurisdiction over the Plaintiffs' underlying litigation pursuant to 19 U.S.C. §1581(c) and sections 516A(a)(2)(A)(i)(I) and (B)(iii) of the Tariff Act of 1930, as amended by 19 U.S.C. §§1516a(a)(2)(A)(i)(I) and (B)(iii) (1999). The Plaintiffs' motion for preliminary injunction is properly before this Court pursuant to 19 U.S.C. §1516a(c)(2) (1999).

There seems to be no dispute as to the events precipitating this motion. As stated, on April 1, 1999, the ITC, pursuant to 19 U.S.C. §1675(c), initiated a sunset review of an antidumping order originally issued in 1989 on certain anti-friction ball bearings from Singapore. Since the antidumping order's inception, there have been ten administrative reviews, with the tenth one resulting in an antidumping duty margin of 1.26%. On July 7, 2000, the Plaintiffs petitioned Commerce and the ITC for an eleventh administrative review but subsequently withdrew this request. Because no other party had asked for an administrative review of this antidumping order, all entries relevant to that administrative review would ordinarily be liquidated at the 1.26% duty rate. Normally, had the administrative review proceeded, the government would have been enjoined from liquidating the relevant entries pending full and final judicial review.[4]

On August 25, 2000, the Plaintiffs filed a summons and complaint challenging the ITC's sunset review final determination in this case. Plaintiffs now seek preliminary injunctive relief to prevent liquidation of all unliquidated entries from January 1, 2000 until judicial review of the ITC's sunset determination is final. The United States consents to the granting of the preliminary injunction.

Defendant-Intervenor objects, arguing Plaintiffs put themselves in this position when they withdrew their request for an administrative review, thereby terminating the administrative review. Because the administrative review was terminated on account of Plaintiffs' actions, Defendant-Intervenor maintains that Plaintiffs effectively lost their *per se* right to a preliminary

---

[4] In *Zenith Radio Corp. v. United States,* 710 F.2d 806 (Fed. Cir. 1983), the United States Court of Appeals for the Federal Circuit granted plaintiffs a *per se* right to a preliminary injunction enjoining liquidation of unliquidated entries pending final judicial review of administrative review determinations. Defendant-Intervenor acknowledges the *per se* right to a preliminary injunction that attaches in cases challenging an administrative review. *See* Defendant Intervenors' Brief, at 2 ("In the case of an annual review, the plaintiff cannot obtain effective relief absent an injunction against liquidation, because without the injunction all entries subject to the litigated annual review would likely be liquidated before litigation could conclude.")

injunction enjoining liquidation of unliquidated entries pending final judicial review. It is noteworthy that Defendant-Intervenor ignores the differences in the two types of proceedings. Administrative reviews are structured to determine the rate at which entries are to be liquidated or to impose no duties if the facts so warrant. Sunset reviews are designed to determine whether an antidumping or countervailing duty order should be terminated or should remain in effect for an additional five-year period. The mere fact that Plaintiffs have elected not to seek an administrative review should not effectively preclude Plaintiffs from obtaining injunctive relief in a different type of proceeding. It would seem bizarre if parties could secure final judicial review in the former while they could not in the latter.

The issue presented in this case is whether, in light of an appeal of an affirmative ITC sunset review determination, the government should be enjoined from liquidating entries entered between the date the antidumping order would have terminated and the completion of final judicial review. Put another way, should the Plaintiffs be entitled to a preliminary injunction enjoining liquidation of all unliquidated entries pending final judicial review where there has been a challenged affirmative ITC sunset review determination.

It is well settled that a preliminary injunction is an extraordinary remedy. Therefore, before the Plaintiffs can be granted such relief they must establish: (1) in the absence of a preliminary injunction, they will suffer irreparable harm; (2) the balance of hardships tilts in the movant's favor; (3) there is a likelihood of success on the merits; and (4) the grant of a preliminary injunction is not contrary to public interest. *See FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). For the reasons stated below, this Court finds that the Plaintiffs have satisfied the four criteria and are, therefore, entitled to preliminary injunctive relief.

A.      Irreparable Harm

Plaintiffs argue they will suffer irreparable harm if the entries of subject merchandise entered into the United States after January 1, 2000 are liquidated prior to the completion of final judicial review of this case.  Specifically, the Plaintiffs argue that if they succeed in their legal challenge to  the ITC's sunset review determination they will suffer the unrecoverable loss of all antidumping duties paid on the liquidated entries, as well as the negation of their statutory right to effective and meaningful judicial review.  The Court finds Plaintiffs' contentions persuasive.

The United States Court of Appeals for the Federal Circuit (Federal Circuit) noted, in *Zenith Radio Corp. v. United States*, that the antidumping laws do not contain a provision permitting the reliquidation of entries or the recovery of wrongfully assessed antidumping duties in the event a foreign manufacturer or exporter successfully challenges an affirmative antidumping determination. 710 F.2d 806, 810 (Fed. Cir. 1983).  Rather, Section 516A(c)(1) of the Trade Agreements Act of 1979 provides, in relevant part:

> Unless such liquidation is enjoined by the court under paragraph (2) of this subsection, entries of merchandise of the character covered by a determination of the Secretary, the administering authority, or the Commission contested under subsection (a)… shall be liquidated in accordance with the determination of the Secretary, the administering authority, or the Commission.

19 U.S.C. §1516a(c)(1).  Thus, "once liquidation occurs, a subsequent decision by the trial court on the merits of [a foreign manufacturer or exporter's] challenge can have no effect on the dumping duties assessed." *Zenith*, 710 F.2d at 810.

The Federal Circuit and this Court have long recognized the severe harm caused by liquidation in cases similar to this case.  Because a foreign manufacturer or exporter cannot recover liquidated duties when it successfully challenges the underlying administrative

determination, in the absence of a preliminary injunction, judicial review would provide the plaintiff with no tangible benefit. *See Zenith*, 710 F.2d at 810. Accordingly, it is now well established that when a foreign manufacturer or exporter seeks a preliminary injunction while challenging the results of an administrative review, "the consequences of liquidation…constitute irreparable injury." *Id.*

Similarly, this Court has held that foreign manufacturers or exporters challenging an administrative review suffer irreparable harm not only because of the economic loss occasioned by the liquidation of disputed entries, but also by the deprivation of their statutory right to obtain meaningful judicial review. *See CHR Bjelland Seafoods A/S v. United States,* 19 CIT 35, 51 (1995); *PG Industries,*11 CIT at 7 (1987); *Oki Electric Industry Co., Ltd. v. United States*, 669 F. Supp. 480, 485 (CIT 1987); *Timken Co. v. United* States, 569 F. Supp, 65, 69 (CIT 1983).

Although the cases cited above involved administrative reviews, the underlying rationale is equally applicable to the present case. The Plaintiffs challenge the ITC's sunset review determination affirming the continuation of an antidumping order. Had the ITC terminated the antidumping order, all entries of subject merchandise after January 1, 2000 would have been liquidated free of any antidumping duties. However, because the antidumping order remains in effect, and because the liquidation of entries is not suspended during the pendancy of the Plaintiffs' legal challenge, the Plaintiffs are faced with potential irreparable harm similar to that faced by parties challenging an administrative review determination in the absence of injunctive relief. As stated, if the United States liquidates the subject entries prior to the completion of final judicial review and the antidumping order is subsequently revoked, the Plaintiffs would be without recourse to recover the wrongfully paid antidumping duties. For judicial review to be meaningful, it must be capable of providing a party with effective relief and the ability to enforce

its rights. Absent a preliminary injunction suspending liquidation, judicial review could not provide the Plaintiffs with meaningful relief. Any judicial remedy would be fruitless.

This Court finds that the Plaintiffs would suffer irreparable harm if any entries were liquidated pursuant to the antidumping order prior to the completion of final judicial review because the Plaintiffs would be unable to recover any duties paid under this order and would be unable to avail themselves of effective and meaningful final judicial review.

### B.      Balance of Hardships

An inquiry into the balance of hardships requires this Court to determine which party will suffer the greatest adverse effects as a result of the grant or denial of the preliminary injunction. The balance of hardships tilts in favor of the Plaintiffs. As stated, if the preliminary injunction were to be denied, the Plaintiffs would suffer the potential unrecoverable loss of all antidumping duties paid on the liquidated entries and the negation of their statutory right to meaningful judicial review. In contrast, United States has consented to the grant of the preliminary injunction and, presumably, has no complaint if the Plaintiffs' motion is granted. Although the Defendant-Intervenor opposes the Plaintiffs motion, it expresses no basis as to how such relief would unduly burden or impose hardship on the Defendant-Intervenor.

This Court finds that the balance of hardships clearly favors the Plaintiffs.

### C.      Likelihood of Success on the Merits

The moving party is required to demonstrate a likelihood of success on the merits of its case before a preliminary injunction will be issued. Although this requirement is important, it is not determinative and must be balanced against the comparative injuries of the parties. *See*

*Timken Co.*, 569 F. Supp. at 70.  This balancing involves an inverse relationship between the level of hardship the moving party will suffer if the preliminary injunction is denied and the standard that must be met to demonstrate a likelihood of success on the merits.  The greater the harm to the moving party, the lower the standard will be.  *See id.*  Where it is clear that the moving party will suffer substantially greater harm by the denial of the preliminary injunction than the non-moving party would by its grant, it will ordinarily be sufficient that the movant has raised "serious, substantial, difficult and doubtful" questions that are the proper subject of litigation.  *PG Industries*, 11 CIT at 8; *See Floral Trade Council*, 17 CIT 1022, 1023 (1993).

The Plaintiffs challenge the ITC's final determination on the grounds that it was unsupported by substantial evidence and otherwise not in accordance with law.  Specifically, the Plaintiffs allege that the ITC erred in both its legal and factual analysis of the likely volume and price effects of anti-friction ball bearing imports from Singapore on the United States domestic market.  The Plaintiffs additionally allege that the ITC improperly interpreted the cumulation provision in the sunset review statute and that its final cumulation decision was unsupported by substantial evidence.  Finally, the Plaintiffs challenge the ITC's interpretation of the sunset review statute's standard for determining the likelihood of injury.

On the papers before this Court, the likelihood of the Plaintiffs success on the merits is unclear.  It is clear, however, that the issues raised by the Plaintiffs are "serious, substantial, difficult and doubtful" and thereby establish them as a legitimate ground for litigation.

This Court finds that the Plaintiffs have raised sufficiently serious legal questions to warrant granting their motion for preliminary injunction.

D.      Public Interest

The final factor that this Court must consider is whether the granting of a preliminary injunction is consistent with public interest.  It is well settled that the public interest is served by "ensuring that the ITA complies with the law, and interprets and applies [the] international trade statutes uniformly and fairly."  *See PG Industries*, 11 CIT at 9, *quoting*, *Ceramica Regiomontana v. United States*, 590 F. Supp. 1260, 1265 (CIT 1984).  Similarly, in the present case, the public interest would be served by preserving the Plaintiffs' right to meaningful judicial review.

In *Neenah Foundry Co. v. United States,* 86 F. Supp.2d 1308 (CIT 2000), the Court denied an application for a preliminary injunction by plaintiff domestic industry to require deposits on future imports, finding no irreparable harm where the ITC had terminated a countervailing duty order as part of a challenged negative sunset review.[5]  In *Neenah* there was no issue as to whether the parties could obtain meaningful judicial review, whereas in the case before this Court, absent preliminary injunctive relief, it is clear the plaintiff-importer will suffer irreparable injury.

This Court finds that the public interest is best served by granting the preliminary injunction.

---

[5] It is interesting to note that the Court entered an unpublished order granting, on consent, a preliminary injunction enjoining liquidation of deposits pending the outcome of a challenged affirmative ITC sunset review determination. *See Chefline Corp. v. United States*, Ct. No. 00-05-00212 (CIT, July 14, 2000).

## CONCLUSION

For the above stated reasons, this Court is persuaded that the Plaintiffs have satisfied the judicially established prerequisites for obtaining a preliminary injunction.  Accordingly, Plaintiffs' motion is GRANTED.

_____
Gregory W. Carman,
Chief Judge


Dated: November _____, 2000
        New York, NY